UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 12 CV 04960

AKEEM BROOKS

PLAINTIFF

*(In the space above enter the full name(s) of the plaintiff(s).)*

-against-

MICHAEL BLOOMBURG
RAYMOND KELLY

DEFENDANTS

*(In the space above enter the full name(s) of the defendant(s). If you cannot fit the names of all of the defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Part I. Addresses should not be included here.)*

**COMPLAINT**

under the
Civil Rights Act, 42 U.S.C. § 1983
(Prisoner Complaint)

Jury Trial: ☒ Yes    ☐ No
(check one)

**PRO SE**

JUN 22 2012
PRO SE OFFICE

## I.    Parties in this complaint:

A.    List your name, identification number, and the name and address of your current place of confinement.  Do the same for any additional plaintiffs named.  Attach additional sheets of paper as necessary.

Plaintiff        Name AKEEM BROOKS
ID # 3491207593
Current Institution  RIKERS ISLAND/OBCC
Address 1600 HAZEN STREET
EAST ELMHURST, N.Y. 11370

B.    List all defendants' names, positions, places of employment, and the address where each defendant may be served.  Make sure that the defendant(s) listed below are identical to those contained in the above caption.  Attach additional sheets of paper as necessary.

*Rev. 05/2007*

1

Defendant No. 1    Name  MICHAEL BLOOMBURG

Shield # MAYOR

Where Currently Employed  MAYOR OF NEW YORK CITY

Address  CITY HALL

NEW YORK , NEW YORK 10007

Defendant No. 2    Name RAYMOND KELLY

Shield # COMMISS.

Where Currently Employed ONE POLICE PLAZA

Address  ONE POLICE PLAZA

NEW YORK ,NEW YORK 10038

Defendant No. 3    Name

Shield #

Where Currently Employed

Address

Defendant No. 4    Name

Shield #

Where Currently Employed

Address

Defendant No. 5    Name

Shield #

Where Currently Employed

Address

## II.    Statement of Claim:

State as briefly as possible the facts of your case.   Describe how each of the defendants named in the caption of this complaint is involved in this action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  Attach additional sheets of paper as necessary.

A.    In what institution did the events giving rise to your claim(s) occur?

B.    Where in the institution did the events giving rise to your claim(s) occur?

C.    What date and approximate time did the events giving rise to your claim(s) occur?

*Rev. 05/2007*

D.    Facts: ON or about September 20th I, AKEEM Brooks was ~~stopped and searched~~ Walking down 3rd Ave between 122nd and 123rd I AKeem Brooks was Stopped and Searched by two undercover plain Clothes detectives

**Who did what?**

Aboved this stop and Seach I was in possession of (2) two bags of of high grade weed and one bag herion I was then placed under arrest and put in a van where I spent the next 4 to 5 hours driving around watching the detectives do the same stop and Search to about 5 other ~~individu~~ individul I was on parole at the time and by this arrest and Coming into Contact with police I was then Voilated and my freedom was taken away from me it destroied my life I've lost my family and I visitation with my Children

---

III.    **Injuries:** See attached addendum

If you sustained injuries related to the events alleged above, describe them and state what medical treatment, if any, you required and received. I am currently taking Psychotropic medications because of / tramatic Encounter with undercover NYPD officals

---

IV.    **Exhaustion of Administrative Remedies:**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Administrative remedies are also known as grievance procedures.

A.    Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

Yes ___ No ___ I was committed to jail as a result of unlawful exercise of official duties

## ( ADDENDUM )

On or about september 20th I(AKEEM BROOKS) was walking down
123rd and 122nd street and 3rd avenue,I was stopped and
searched by two plain clothes detectives.Upon this stop and
search, I(AKEEM BROOKS)asked the detectives why was I being
stop fore, the detectives reply was that I looked suspicious
and out of place, so I followed what the two detectives called
procedure.

On that day I WAS HUMILIATED IN FRONT THOUSANDS of PEOPLE-the two
detectives throw me on the wall and proceeded to search me in
broaddaylight..

THE detectives told me to open my mouth and I followed their
order.I was then asked to take off my boots and socks and I
again I followed their order.I was then placed back on the
wall where the detectives begin searching me with a pair of
gloves on.

The search took 30 minues then the detectives told me if I give
them the drugs that they would let me go home to my family but
they lied to me because right after I give them the two(2)bags
of high grade weed and one (1)bag of heroin of my person useage
they throw the handcuffs on and arrested me, My rights were not
read to me,I was placed in a police van where Iwatch the same
officers for 4 to 5 hours do the same thing to 10 other i i
indivdualsand arrested them as well even when they did not
have anything,drugs,guns,knives,ect.

As a result of this arrest Ive lost allcontact with mykids it has changed my life entierly.......

                    THIS IS JUST AN AWFUL CASE,THE FACTS ARE HORRIFIC AND DISTURBING BUT TRUE

ATTACHED YOU WILL FIND DAILYNEWS EXHIBITS PERTAINING TO ILLEGALITY  OF STOP&FRISK SEARCHES

## OCCUPY WALL STREET

# 30 busted in Harlem protest vs. stop-frisk

BY MATTHEW DELUCA
and JOSE MARTINEZ
DAILY NEWS WRITERS

THE NYPD collared some 30 protesters Friday – including Princeton University Prof. Cornel West – during a Harlem demonstration against police stop-and-frisks, not Wall

defended the tactic, and police brass say it saves lives, particularly in minority communities.

The protesters had earlier marched on the sidewalk along 125th St. before massing outside of the stationhouse, chanting: "Stop-and-frisk has got to go!"



# Stop and frisk this debate

### Richard Cohen



Mayor Bloomberg has a new kind of crime statistic. It is not the astoundingly low number of murders committed in his fair city — 471 in 2009 versus about 2,000 per year in the 1980s — but murders *not* committed in the last decade: 5,600.

Those people are alive today by the grace of God and the policing policies of the Bloomberg administration, particularly what is known as stop-and-frisk. New York City is heaven on Earth, possibly because it is a certain kind of hell for young black and Hispanic men.

Here, too, the mayor has his statistics, and they are as fittingly gargantuan as the city itself: 685,724. That is the number of times last year the police stopped someone on the street and frisked him (or the occasional her) for weapons. (In 2002, the figure was 97,296.)

For all that effort, the results are paltry: 780 guns confiscated. I to the mayor's critics, that shows there is something awfully wrong with the program.

But to the mayor and his defenders, the low rate of returns proves that the program is working. The gun-toters of yesterday know better than to walk the streets of New York packing heat. This means that when one gentleman disrespects another gentleman, one or the other of them does not reach for a gun. The proof in this case is not the number of guns seized but the number of bodies not taken to the morgue.

Bloomberg has a point.

Inevitably, there is a racial aspect to all this. Young black and Hispanic men constitute only 4.7% of the city's population, yet in 2011 they represented about 42% of all stops. For some critics of the program, this statistic is both damning and, as they say, dispositive. The program is racist on its face. But as Bloomberg — but not his critics — say, dispositive. The program is racist on its face. But as Bloomberg — but not his critics — notes, blacks and Hispanics comprise 90% of all murder victims. The only people who don't seem to know this are certain politicians pandering for votes and The New York Times, whose recent editorial on this issue omitted awkward statistics regarding the ethnicity of both killers and their victims.

I am neither young nor black (nor His-panic), but if I were, I'd sure abhor stop-and-frisk. It has to be infuriating to be stopped from time to time by the very cops I am paying to protect me. The presumption of guilt based mostly on color or ethnicity (and youth) raises profound civil liberties issues and clearly alienates elements of the minority-group community. We bend over backward to protect the innocent or the Miranda rule, the right to a lawyer — and yet permit the cops to invade the privacy and personal space of just about anyone.

Still, the Bloomberg statistic resonates. New York City is largely crime-free (except for Wall Street), and that, as the number-crunching mayor is glad to tell you, is central to a robust economy. Whole areas of the city have risen from the dead. Stores have opened. People stroll the streets. The sound of a car alarm is almost nostalgic, and the handmade sign to save thieves the bother — "No Radio" — is seen no more. New York is a vast movie set.

As with the killing of Trayvon Martin by George Zimmerman, race is not only a complicating and highly emotional factor

## Under Bloomberg, the city's far safer — but minority youth have reason to feel aggrieved

but one that does not always get discussed in an open manner. A suffocating silence blankets these incidents. Accusations of racism are hurled at those who so much as mention the abysmal homicide statistics — nationally, about half of all murders are committed by blacks, who represent just 12.6% of the population — and they come, more often than not, from liberals who advocate candor in (almost) all things. Others reply as if there are no basic questions of civil rights and civil liberties at stake.

The dangers of generalizations and of stereotyping should be obvious. So, too, are the dangers of crime and its pernicious effects on its victims — not just the immediate ones, but whole neighborhoods and, after a while, the whole city.

The argument Bloomberg makes is a good one; so, too, is the one made by those who worry about the cost to racial and ethnic harmony of repeated and clearly entrapping stop-and-frisks. This is an issue worthy of a full-throated debate, not recourse to censorious political correctness. All voices should be heard — including those of Bloomberg's 5,600.

cohen@washpost.com



DAILY NEWS  NYDailyNews.com

## BOSH OUT
Heat forward could miss rest of Pacers series

## SPORTS

**14**    Monday, May 21, 2012

DAILY NEWS NYDailyNews.com

# Half of subway stop-frisks are thugs: ex-chief



Pete Donohue
ON THE SUBWAYS

From the subways comes a revealing statistic about the NYPD's controversial stop, question and frisk policy — one that made a police commander "comfortable" but not entirely pleased.

"Almost all the people we stopped had criminal records," said Steve McCallister, who from 2005 to 2008 was commanding officer of the NYPD transit bureau districts encompassing all of Manhattan and a sliver of the Bronx.

McCallister recalled that during his tenure — part of the early years of stop-and-frisk's use in the transit system — he scrutinized the reports officers would file to document the circumstances of each stop, and the reason for it.

He said he also ran background checks on the riders who were confronted.

"I felt comfortable with that," McCallister, now a police chief on Long Island, said of evidence his cops zeroed in on crooks nearly half the time. "Not completely happy, but comfortable that we were stopping the right people."

The NYPD stop, question and frisk tactic is supposed to have officers confront people they suspect have just committed a crime or may be about to do something illegal.

But detractors say it has been applied in ways that amount to racial profiling.

"It's not about throwing every black or brown guy up against the wall," McCallister said. "That's lazy, bad police work. It's gross and an injustice to millions of people who ride the subway."

The subway is a unique environment, where a core group of incorrigible pickpockets make a living

stealing from riders. They're responsible for much of the crime, and have been arrested repeatedly. On any given day, McCallister said, included about half of them are in jail or prison.

Transit police know their mugs — bad guys like the bug-eyed Rafael Toscano; big Michael Coley, who tips the scale at 275 pounds, and the diminutive William Hood.

"We went after people we knew," McCallister said. "If we saw them in the system, we went right after them. If you're undercover, you do an operation and see if they commit a crime. If in uniform, you'd go

over and say, 'Hey — what are you doing in the subway?'"

Suspicious behavior that would also warrant a stop, McCallister said, included lingering on a platform and scanning the crowds while trains come and go. It's not the way an ordinary rider would behave, and it's indicative of someone who is "hunting" for a victim, he said.

The motivating factor wasn't supposed to be race, he said, though the approach led to a majority of those stopped being black or Latino — as is true for stops above ground.

"He's describing exactly what

the Supreme Court identified as appropriate," said Chris Dunn, associate legal director of the New York Civil Liberties Union, who is a vocal critic of the NYPD practice.

"An experienced officer who knows the scene, knows the players and can make informed judgments about suspicious behavior that might lead to a stop and frisk — we're not troubled by that at all," he added. "We've always said it's a valid tactic when used properly."

McCallister and Dunn are not likely most people would think would see eye-to-eye on the issue.

But, unfortunately, amid the widening controversy over the stop, question and frisk program, the debate has descended into hyperbole.

Critics are dubbed unrealistic lefties whose desire to have the program scrapped would result in murder and mayhem.

Supporters are seen as right-wing nuts who don't care about constitutional protections against a police state or about the mistreatment of minorities.

The bottom line is stop-and-frisk is supposed to be a tool used with precision, not a net cast crudely and widely.

It's not something a rookie fresh out of the academy, or just any rank-and-file cop, should wield without strict supervision — and scrutiny of the reports they submit.

[/DNTEXT]pdonohue@nydailynews.com

LY NEWS/NYDailyNews.com

Saturday, May 19, 2012  21

Email to voicers@nydailynews.com, or send fax to (212) 210-1505,
or post your letter to Voice of the People, Daily News,
4 New York Plaza, New York, NY 10004,
Please include full name, address and daytime phone number.
The Daily News reserves the right to edit letters.

# VOICE OF THE PEOPLE

# NYPD can't stop stop-and-frisk

**B**rooklyn: Re NYPD Commissioner Ray Kelly's controversial stop-and-frisk program, I have a simple solution: The police can continue to stop every person of color they want, but they have to stop an equal number of Caucasians as well. This way, the police can continue their pursuit of reduced crime, and the munity can feel that people are being treated equally. *Jimann Cole*

ining. Voicer Helen Groel is right regarding stop-and-frisk. If you r to block it in your neighborhood, fine. But not in mine. *Jay Zach*

th Massapequa, L.I.: Don't the city babies opposed to stop-and-r realize that a majority of the stops are happening in the most angerous areas? If it happens that those areas are heavily populated th minorities, perhaps community leaders should look for solutions, be excuses. *Patrick Hickey Jr.*



**DAILY NEWS** NYDailyNews.com

# 'Clean hall' patrol rule

## Cops need probable cause for arrest

**BY ROCCO PARASCANDOLA**
NEW YORK DAILY NEWS

ON THE HEELS of a class-action lawsuit that accuses the NYPD of making unjustified arrests, Police Commissioner Raymond Kelly issued new rules for how cops can patrol in privately owned apartment buildings, the Daily News has learned.

The order, issued Monday, says officers need probable cause to arrest someone for trespassing — and that police should take "reasonable measures," such as asking for ID or building keys, to verify whether someone who is stopped and questioned has a right to be there.

In the past, police have also taken the additional step of verifying those claims — by knocking on someone's door, for example. But that scenario isn't addressed in the new order.

Landlords who register for Operation Clean Halls give police permission to routinely "vertically patrol" their buildings.

But the New York Civil Liberties Union filed a federal suit in March that accused the NYPD of routinely violating the rights of residents — most of them black or Latino — by making unjustified trespassing arrests in those buildings.

The group said residents have learned to carry ID at all times or risk getting arrested while throwing out their garbage or getting their mail. It also said police assumed the program gave them the right to stop people outside the buildings participating on Clean Halls.

"It absolutely seems like the rules were not spelled out clearly at all," said Alexis Karteron, senior staff lawyer for the NYCLU. "It seems like the order recognizes there are serious problems with the program, but the NYPD still as a long way to go."

Kelly has said Operation Clean Halls is intended to add a layer of security for people who can't afford to live in dorman buildings.

*rparascandola@nydailynews.com*

---

**DAILY NEWS** NYDailyNews.com

# Policy in flux: Bloomy

**BY TINA MOORE**
NEW YORK DAILY NEWS

CHANGES TO the NYPD's stop-and-frisk program were under way long before a federal judge granted class-action status this week to a lawsuit filed against the city, Mayor Bloomberg said.

"This is something, if you look and go back six weeks ago, Kelly began a process really of making local precinct commanders responsible for the stop-and-frisk, and reporting, checking the quality," Bloomberg said Friday on WOR-AM radio. "He's been working."

Bloomberg and Police Commissioner Raymond Kelly have both said that stop-and-frisks have helped drive down crime — especially in poor and high-crime areas.

"If we kept that old rate though that we inherited, 5,600 people who are alive today would be dead, and if history's any guide . . . an overwhelmingly number of those would have been young, black and Hispanic men — 90% of them," Bloomberg said.

Kelly said there will be more training for cops and closer scrutiny from supervisors. An order has been reissued to cops spelling out that racial profiling is against department policy.

Police made a record 685,724 stops last year. More than 52% were black, 34% were Hispanic and 9% white, NYPD records show.

*tmoore@nydailynews.com*

4   Wednesday, May 23, 2012



# 'PROFILE' IN RAGE

PHOTOS BY AARON SHOWALTER

## Cops wrong, bust top student

**EXCLUSIVE**

**BY JOHN MARZULLI**
NEW YORK DAILY NEWS

A BLACK TEEN honor student at an all-girl Catholic high school claims she was roughed up by plainclothes NYPD cops who thought she matched the description of a shoplifting suspect, the Daily News has learned.

Police later realized Brittany Rowley didn't commit the crime — but she is still haunted by the nightmare she experienced on a Park Slope street and the three hours spent handcuffed to a bench in a police stationhouse.

"It was terrifying," Rowley, 15, said in an exclusive interview. "It is the most horrible thing I have ever experienced."

Her father said he's outraged by the incident and on Tuesday filed notice of a $5.5 million lawsuit against the city and Sgt. Jonathan Catanzaro and Officer Stephen Nakao of the 78th Precinct. The court papers allege false arrest and excessive force, including that the sergeant slammed Rowley to the pavement and flung his keys at her.

"I feel my daughter was racially profiled," Delmus Rowley said.

"They had no proof, just a description of a black young lady with braids," he added. "It wasn't necessary to tackle a 15-year-old girl. It was excessive."

There is no dispute that two black teen girls shoplifted shorts and jeans from Rivet, a clothing store on Seventh Ave., last Friday around 3:30 p.m. A description of the suspects was broadcast by police at 3:44 p.m. — two female black teens, dark hair, one had a ponytail, one had braids, police said.

Catanzaro and Nakao were patrolling in an umarked car when they spotted Rowley and a friend walking on Prospect Park West. Rowley had braided hair extensions tied together.

Rowley, a freshman at St. Savior High School, and her friend were going to the library when she noticed a vehicle trailing them.

The accounts diverge at this point. Rowley said the car suddenly reversed and a male yelled, "Get them!" The cops claim they said, "Excuse me ladies," with their badges out.

Rowley and her friend ran. "I thought we were being abducted," Rowley said.

Catanzaro tackled Rowley and threw her to the ground. He threw his keys, she said, hitting her leg. She recalled him saying, "Why did you f------ run? I should punch you."

She claims Catanzaro yanked her up, whipsawing her neck. She says police also snapped on cuffs, causing bruises. Her friend returned and was collared too.

An NYPD official insists the incident was good police work, noting that Catanzaro obtained surveillance tape from the clothing boutique that exonerated Rowley, even after the store manager identified her as the suspect.

"But for him viewing the videotape, the young lady would still be in custody," said Inspector Kim Royster, an NYPD spokeswoman.

The Rowleys' lawyer, Sanford Rubenstein, said the arrest shows the growing concern civil rights advocates have with the NYPD's crimefighting tactics.

"It is not a surprise that parents fear more that their children will suffer violence at the hands of the police than from common criminals," Rubenstein said.

jmarzulli@nydailynews.com

Brooklyn teen Brittany Rowley says police grabbed her as a suspect in a robbery at Park Slope store (upper left). She says she was roughed up walking near Prospect Park West (upper right). Jesse Ward

If YES, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

_____ Manhattan Detention complex _____

_____

B.    Does the jail, prison or other correctional facility where your claim(s) arose have a grievance procedure?

Yes ____    No ____    Do Not Know ____    N/A

C.    Does the grievance procedure at the jail, prison or other correctional facility where your claim(s) arose cover some or all of your claim(s)?

Yes ____    No ____    Do Not Know ____

If YES, which claim(s)? _____

D.    Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose?

Yes ____    No ____

If NO, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

Yes ____    No ____

E.    If you did file a grievance, about the events described in this complaint, where did you file the grievance?

_____

1.    Which claim(s) in this complaint did you grieve? _____

_____

2.    What was the result, if any? _____

_____

3.    What steps, if any, did you take to appeal that decision?  Describe all efforts to appeal to the highest level of the grievance process. _____

_____

_____

_____

_____

F.    If you did not file a grievance:

1.    If there are any reasons why you did not file a grievance, state them here: _____

_____

_____

_____

2.    If you did not file a grievance but informed any officials of your claim, state who you

informed, when and how, and their response, if any: _____

_____
_____
_____
_____

G.    Please set forth any additional information that is relevant to the exhaustion of your administrative remedies. _____

_____
_____
_____
_____
_____
_____

Note:   You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.

V.    Relief:

State what you want the Court to do for you (including the amount of monetary compensation, if any, that you are seeking and the basis for such amount).   PLAINTIFF DEMANS the amount of(3,000,000)three million dollars in compensatory damages and(2,000,000)two million dollars in punitive damages plaintiff also request order from the courts directing the defendants to serrender to the courts bank accounts pass ports ,portfolio, stocks,titles of properties to be deposited in an escrow account until final determination of this action.....

_____
_____
_____
_____
_____
_____
_____

**VI.    Previous lawsuits:**

<table><tr><td>On these claims</td></tr></table>

A.    Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

Yes _____    No _____

B.    If your answer to A is YES, describe each lawsuit by answering questions 1 through 7 below. (If there is more than one lawsuit, describe the additional lawsuits on another sheet of paper, using the same format.)

1.    Parties to the previous lawsuit:

Plaintiff _____

Defendants _____

2.    Court (if federal court, name the district; if state court, name the county) _____

3.    Docket or Index number _____

4.    Name of Judge assigned to your case _____

5.    Approximate date of filing lawsuit _____

6.    Is the case still pending?  Yes _____    No _____

If NO, give the approximate date of disposition _____

7.    What was the result of the case? (For example:  Was the case dismissed?  Was there judgment in your favor?  Was the case appealed?) _____

_____

_____

<table><tr><td>On other claims</td></tr></table>

C.    Have you filed other lawsuits in state or federal court otherwise relating to your imprisonment?

Yes _____    No _____

D.    If your answer to C is YES, describe each lawsuit by answering questions 1 through 7 below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same format.)

1.    Parties to the previous lawsuit:

Plaintiff _____

Defendants _____

2.    Court (if federal court, name the district; if state court, name the county) _____

3.    Docket or Index number _____

4.    Name of Judge assigned to your case _____

5.    Approximate date of filing lawsuit _____

6.    Is the case still pending?  Yes _____    No _____

If NO, give the approximate date of disposition _____

*Rev. 05/2007*

6

7.    What was the result of the case? (For example:  Was the case dismissed?  Was there judgment in your favor?  Was the case appealed?) _____

_____

_____

**I declare under penalty of perjury that the foregoing is true and correct.**

Signed this 29th day of May , 2012

Signature of Plaintiff    _Hm Brooks_

Inmate Number    3491207593

Institution Address    rikers Island/OBCC

1600HAZEN STREET

EAST ELMHURST, N.Y.11370

Note:    All plaintiffs named in the caption of the complaint must date and sign the complaint and provide their inmate numbers and addresses.

I declare under penalty of perjury that on this 29th day of May , 2012, I am delivering this complaint to prison authorities to be mailed to the *Pro Se* Office of the United States District Court for the Southern District of New York.

Signature of Plaintiff:    _Hm Brooks_